**Affirmed as Modified and Opinion Filed May 13, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-14-01626-CR
_____

**MARK EDWIN GUIDA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1263747-V**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Whitehill
Opinion by Justice Whitehill

Appellant strangled his girlfriend and then burned her body in a car. Appealing from his murder with a deadly weapon conviction, for which he was sentenced to ninety-nine years imprisonment, appellant asserts four issues arguing that:

(i) the trial court erred by not suppressing his statement to police because it was made without *Miranda* warnings while he was in custody,

(ii) it was an abuse of discretion to admit into evidence his cell phone records showing location data because the records were obtained without a search warrant,

(iii) it was an abuse of discretion to admit into evidence three gruesome photographs of the victim's burned body that were cumulative and prejudicial, and

(iv) the trial court erred in dismissing the first jury panel off the record.

In a cross-point, the State asks that we reform the judgment to reflect the jury's deadly weapon finding.

For the reasons discussed below, we reject appellant's arguments because we conclude that:

(i) *Miranda* warnings were not required, and the trial court did not err in denying the motion to suppress, because there was evidence from which the trial court could have reasonably found that appellant was not in custody when he was interviewed by the police;

(ii) there was no Fourth Amendment violation and the trial court did not err by admitting the cell phone records into evidence because appellant had no legitimate expectation of privacy in records showing location data held by a third-party cell phone company;

(iii) the photographs were not erroneously admitted because the trial court could have reasonably concluded that they were no more horrific than the crime itself and had probative value that was not substantially outweighed by the danger of unfair prejudice; and

(iv) appellant's issue concerning the dismissal of the jury panel was not preserved for our review.

Additionally, the record reflects that the jury made a deadly weapon finding. We therefore modify the judgment to reflect this finding, and as modified, affirm the trial court's judgment.

## I. Background

In response to a 911 call, Dallas police discovered appellant's girlfriend's body in a burning vehicle with license plates registered to appellant. A subsequent autopsy showed that (i) her death was caused by strangulation and (ii) she was dead before the fire started.

The lead detective on the case, Paul Ellzey, called appellant the next day and asked him to come to the police station for an interview. Appellant agreed, and the interview was recorded. Appellant was not *Mirandized* before the interview began.

During the interview, appellant provided information about himself and the victim. He sketched out a timeline to show his activities the previous day by voluntarily referencing text messages on his phone and looking at credit card account charges. While the interview was in progress, however, Ellzey learned that there was surveillance video of appellant that showed him purchasing two plastic gas canisters at a gas station.

When Ellzey told appellant that he knew appellant's timeline was false, appellant requested a lawyer and the interview terminated. Ellzey then placed appellant under arrest.

Prior to trial, appellant moved to suppress his statement to Ellzey, claiming that he was not *Mirandized* before his custodial interrogation. At the hearing on appellant's motion, the court heard testimony from Ellzey and viewed the interview videotape.

The court announced its ruling on appellant's motion at a subsequent hearing. The trial judge held that, although the interview began at 3:05 p.m., interrogation did not commence until 5:29 p.m. (about four minutes before appellant requested an attorney). The motion to suppress was granted as to anything that came after 5:29 p.m., but was otherwise denied.

On November 18, 2014, the court called the case to trial and stated on the record that the parties had not succeeded in selecting a jury the day before. The judge noted that "voir dire was conducted but the panel was dismissed with the agreement of both sides." Both the State and the defense then announced ready for trial and selected a jury from the new venire.

At trial, appellant's and the victim's cell phone records were admitted into evidence over appellant's objection, and an FBI agent testified about the location data in those records to establish appellant's location at various times on the day of the murder. According to the FBI

agent, these records corroborated the State's theory that appellant killed his girlfriend, drove her car to the gas station to purchase gas while her body was inside the car, and then drove to the location where the burned car was found.

The victim's son testified that, on the day of the murder, he looked under the door to his mother's bedroom and saw appellant on top of his mother, fighting. He heard his mother say that she could not breathe, and then she stopped moving and was silent. On cross-examination, however, the son admitted that his trial testimony was not consistent with what he previously told a forensic interviewer.

Appellant testified in his defense. Although he admitted lying to Ellzey during the interview, and offered a new version of events, he denied killing his girlfriend.

When both sides rested, the jury found appellant guilty and, after a punishment hearing, assessed punishment at ninety-nine years imprisonment.

## II. Analysis

**A.      First Issue: Was appellant's statement to the police inadmissible because he was subjected to custodial interrogation without *Miranda* warnings?**

Appellant argues that he was in custody when he gave his statement to the police and therefore should have been *Mirandized*.[1] It is undisputed that appellant was not advised of his rights when he began his interview with the police. Therefore, his statement is inadmissible if it was custodial. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

### 1.      Standard of Review

We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial

---

[1] Appellant's motion to suppress challenged the statement as both a violation of article 38.22 and *Miranda*. Article 38.22 provides that a defendant must be provided with warnings virtually identical to those required by *Miranda*, as well as a warning that an accused has the right to terminate the interview at any time. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22; *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). Our analysis here is the same as to both.

court's factual findings for abuse of discretion and review de novo the trial court's application of the law to the facts. *Id.* We give almost total deference to a trial court's determination of historical facts, especially those based on evaluating witness credibility or demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). And, at a suppression hearing, the trial court is the sole and exclusive factfinder and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

### 2. What constitutes custodial interrogation?

*Miranda* requires a law enforcement officer to warn an individual of certain constitutional rights if the individual is considered to be the subject of "custodial interrogation." *See Miranda*, 384 U.S. at 444. Conversely, the *Miranda* requirements do not apply if the statements do not result from custodial interrogation. *Dowthitt v. State*, 931 S.W.2d 244, 263 (Tex. Crim. App. 1996); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*Miranda* warnings are only required when there has been such a restriction on a person's freedom as to render him "in custody").

The accused has the initial burden to establish that his or her statements were the product of a custodial interrogation. *Herrera*, 241 S.W.3d at 526. Accordingly, the State need not "show compliance with *Miranda* . . . warnings unless and until the defendant proves that the statements he wishes to exclude were the product of custodial interrogation." *Id*. at 526 (citing *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)).

There are at least four general situations which may constitute custody for purposes of *Miranda* and article 38.22: (i) when the suspect is physically deprived of his freedom of action in any significant way, (ii) when a law enforcement officer tells the suspect that he cannot leave, (iii) when law enforcement officers create a situation that would lead a reasonable person to

believe that his freedom of movement has been significantly restricted, and (iv) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 255. For any of these situations to constitute custody, "the restriction upon freedom of movement must amount to the degree associated with an arrest . . . ." *Id.* (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

### 3. Would the circumstances of appellant's interview lead a reasonable person to conclude that he was not free to leave?

Appellant initially argued that the entire interview constituted custodial interrogation. But counsel clarified appellant's position at oral argument to be that custody began when appellant started talking to Ellzey about his timeline and tried to leave the room. This distinction, however, does not affect our analysis.

Appellant was one of several people, including family members, scheduled to be interviewed. When Ellzey contacted appellant, he was extremely cooperative. Appellant said that he had no place to stay since his name was not on the victim's apartment lease, so he planned to return to Louisiana.

The victim's brother-in-law, Phil Spencer, accompanied appellant to the police station on December 21. Another detective interviewed Spencer at the same time, and did not tell him that appellant was a suspect.

Appellant had been crying and appeared to be genuinely upset. Ellzey said that he did not give appellant *Miranda* warnings because he was "a family member" being interviewed for vital information and was not a suspect.

The interview began at approximately 2:50 p.m. when Ellzey began by asking appellant background information such as his birthdate, family information, and address. He then asked appellant to help him understand who the victim was.

Appellant was very cordial, and provided details about the victim's children and work, how he met her, and their relationship. He explained that he had known the victim for four years, and had just moved into her apartment with her and her children. He was concerned about Ellzey making value judgments about the victim because she worked as a dancer. Ellzey assured appellant that he would not do so.

When appellant requested something to drink, Ellzey gave him choices and then brought him some water. Ellzey can be heard whistling as he leaves the room to get the water.

Appellant had his cell phone with him, and it was on throughout the interview. Appellant sent text messages, retrieved data, and at one point, called his mother. Ellzey said he would not have allowed him free access to his phone had appellant been considered a suspect rather than a witness.

Ellzey asked appellant to discuss his conduct on the day of the murder. One task that appellant identified was stopping to get some cash. Appellant then voluntarily used his cell phone to check his bank account for information on where he got the cash, and to identify other charges he had made.

Shortly after the interview began, appellant asked if he was a suspect. Ellzey replied that, "at this point everyone is a suspect because we know nothing." Appellant seemed satisfied, and assured Ellzey that he wanted to do everything he could to help find the person responsible for the crime.

As appellant was trying to recall the timing and sequence of events on the prior day, Ellzey gave him a pen and paper to construct a timeline. Appellant readily agreed, and devoted considerable effort to looking up details on his phone.

At one point, Ellzey asked appellant how the timeline was progressing. Appellant replied that he was still working on it, and Ellzey asked if there was time for him to make a pot of coffee. Appellant replied affirmatively.

While Ellzey was out, appellant walked out of camera range. There are noises on the video. Appellant argues the noises sound like appellant is trying to open the door and then sound like he knocked on the door. Appellant asked Ellzey for more paper, and sat back down. Nothing in his tone or posture suggested that appellant believed that he was confined or not free to go. The door is not visible on the video, and there is no discussion in the interview about whether it was locked or otherwise secured.

Later, appellant knocked on the door again, and sat back down. There are no audible sounds of a door handle being turned. Thus, the record is silent as to whether appellant could have opened the door on his own.

When Ellzey returned to the room, the tone was still conversational, relaxed, and non-confrontational. Ellzey said that he was going to check his messages and appellant asked if he could get out of the room. Ellzey replied, "Yeah, give me just a minute," and then left the room.

While Ellzey was out of the room, appellant called his mother on his cell phone. He was calm, and did not say that he was in custody or believed that he was not free to go. In fact, appellant said that he left his dog at a kennel and planned to pick it up that night before returning to his motel. He also asked his mother who would be picking him up in Dallas to assist him with his return to Louisiana. And appellant told his mother that he wanted to come to the police station so that he could tell the police about what kind of a person the victim was so that she would not be judged harshly. Finally, he told his mother, "This guy seems cool."

As the interview progressed, other detectives were providing Ellzey with information, and he began to believe that appellant was not being truthful. One detective told him that he had

viewed gas station surveillance video that showed appellant buying gas canisters and doing things he had not mentioned to Ellzey.

Ellzey returned to the interview room at approximately 5:21, and appellant asked for more water. Ellzey said, "Sure, come on," and the two left the room together.

When appellant and Ellzey returned to the room, Ellzey told appellant that his timeline was not accurate, and asked where he was at 5:49 the previous day. He then told appellant that there was surveillance video of him purchasing gas canisters at gas station, which appellant denied.

At 5:33, appellant requested a lawyer. When appellant invoked his right to counsel, Ellzey's questioning ceased, and he told appellant that he was being charged with capital murder and was not free to go.

Ellzey's testimony at the suppression hearing confirmed that appellant was not a suspect when the interview began. He also said that the interview room was not locked because appellant was a witness being interviewed. Furthermore, appellant was free to come and go and there was no officer at the door. On cross-examination, Ellzey said that another officer could have locked the door, but he believes he would have heard it because the deadbolt lock makes a loud click noise.

For several reasons, we conclude that, on this record, the trial court could have reasonably concluded that appellant did not meet his burden to show that he was in custody until just before the interview ended. He voluntarily went to the police station with a family member who was also scheduled to be interviewed. He said that he wanted to talk to the police and assist with the investigation.

Furthermore, up to the point when appellant asked for a lawyer, Ellzey never told appellant that he could not leave, nor did his tone and demeanor suggest this. Likewise,

–9–

appellant's tone and demeanor do not suggest that he believed he was not free to go. When appellant asked if he could get out of the room, Ellzey agreed and asked him to wait a minute. Appellant did not protest. In fact, when appellant asked for more water, he and Ellzey left the room.

Additionally, there is no direct evidence that the door to the interview room was locked, and we decline to speculate about whether it was locked or if or why appellant knocked on the door. Ellzey affirmatively testified that he did not lock the door, and we defer to the trial court's implied finding that his testimony was credible. *See e.g., State v. Kelley*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006) (appellate court implies necessary findings to support trial court's ruling).

Appellant was extremely cooperative, constructing his timeline with painstaking detail. He volunteered information, including the charges made to his bank account. The exchange between Ellzey and appellant remained congenial and relaxed, and appellant did not appear to be intimidated or threatened.

Moreover, unlike a suspect, appellant was allowed free access to his cell phone, and used it to respond to text messages, access data, and call his mother. When speaking with his mother, he said that Ellzey seemed "pretty cool" and talked about his plans for later in the evening. Appellant gave no indication that he ever believed he was not free to go.

Finally, appellant contends that Ellzey's "overt questioning" constituted interrogation. But even if we were to characterize the questioning as interrogation, *Miranda* is not triggered unless appellant was also in custody. *See Miranda*, 384 U.S. at 444; *see also Oregon v. Mathiason,* 429 U.S. at 495 (holding that interrogation was not custodial).

–10–

For the above reasons, the trial court did not err in concluding that *Miranda* warnings were not required until four minutes before Ellzey placed appellant under arrest. We thus resolve appellant's first issue against him.

**B.      Second Issue: Was it error to admit appellant's cell phone records showing cell site location data?**

Appellant objected on various grounds when the State called FBI Special Agent Mark Sedwick who used their cell phone records to testify about appellant's and the victim's locations on the day of the murder. The trial court overruled all of the objections.

Appellant's brief argues that the trial court erred in doing so because the State obtained the records without a search warrant in violation of the Fourth Amendment.[2] But in the interim, the Texas Court of Criminal Appeals decided *Ford v. State*, which held that a warrantless search of cell phone records' location data does not violate the Fourth Amendment. *Ford v. State*, 477 S.W.3d 321, 330 (Tex. Crim. App. 2015). And, as appellant acknowledged at oral argument, *Ford's* salient facts are indistinguishable from the facts in this case.

In *Ford*, the State used four days of historical cell phone data to show the defendant's location on the day of and the day following a murder. *Id*. at 321. The cell phone data was obtained from the cell phone provider without a warrant, and the defendant argued that using that data violated his Fourth Amendment protection against unreasonable search and seizure.

The court of criminal appeals disagreed, holding that the government did not violate the defendant's Fourth Amendment rights. *Id*. at 335. In so concluding, the court noted that Ford "had no legitimate expectation of privacy in records held by a third-party cell phone company identifying which cell-phone towers communicated with his cell phone at particular points in the past." *Id*. at 330.

---

[2] Contrary to appellant's assertion, there was a search warrant, but it was obtained a month after the court order authorizing the subpoena of the records.

The same type of non-content cell phone location data is at issue here, and *Ford* controls our analysis. Therefore, the trial court did not err by admitting the cell phone records into evidence. *See Doyal v. State*, No. 05-14-00943-CR, 2016 WL 447528, at *3 (Tex. App.—Dallas Feb. 4, 2016, no pet. h.) (mem. op.); *Speers v. State*, No. 05-14-00179-CR, 2016 WL 929223, at *8 (Tex. App.—Dallas March 10, 2016, no pet. h.) (mem. op.). We thus resolve appellant's second issue against him.

C. **Third Issue: Did the trial court abuse its discretion by admitting three photographs of the victim's burned corpse?**

At trial, appellant objected to the admission of three photographs based on "rule 403" and because they were "inappropriate." The State responded that over 300 photographs were taken and had been narrowed down to only the bare minimum necessary to show the crime scene as described. Appellant's third issue complains that the trial court abused its discretion in admitting these crime scene photographs—State's exhibits 21, 22 and 23—because they were cumulative and unduly prejudicial.

1. **Standard of Review and Applicable Law**

The admissibility of photographs is within the trial court's sound discretion. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004). And we will not disturb a trial court's evidentiary ruling if the trial court's decision falls within the "zone of reasonable disagreement." *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990).

Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403; *see Gigliobianco v. State*, 210 S.W.3d 637, 640 (Tex. Crim. App. 2006). Moreover, rule 403 favors admitting relevant evidence and carries a presumption that relevant

evidence will be more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

In addition to usual Rule 403 considerations, in deciding whether to admit photographs, a trial court may consider the following factors to determine whether the danger of unfair prejudice substantially outweighs the evidence's probative value: (i) the number of photographs, (ii) the size of the photograph, (iii) whether the photographs are in color or black and white, (iv) whether the photographs are gruesome, (v) whether the body is naked or clothed, and (vi) whether the body has been altered by autopsy. *Reese v. State*, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000). Courts should also consider other available means of proof and the circumstances unique to each individual case. *Emery v. State*, 881 S.W.2d 702, 710 (Tex. Crim. App. 1994).

### 2. Was the trial court's balancing of probative value against the danger of unfair prejudice outside the zone of reasonable disagreement?

The photographs at issue show the condition of the victim's body as it was found in the burned-out car at the crime scene. The record does not reflect the photographs' size or whether they were originally in color or black and white. It is also not possible to determine whether the victim was clothed.

While the photographs are gruesome, a trial court does not err merely because it admits gruesome photographs into evidence. *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995). Moreover, although the pictures show a disturbing reality, they are no more gruesome than the facts of the offense itself. *See Orr v. State,* 306 S.W.3d 380, 402 (Tex. App.—Fort Worth 2010, no pet.) (photographs were probative of injuries and no more gruesome than would be expected).

Appellant nonetheless contends that showing the victim's burned corpse had little inherent probative force. We disagree. After the photographs were admitted into evidence, a police officer used the photographs to testify about the crime scene. Thus, the photographs had

–13–

probative value because they provided context for the officer's testimony about the crime scene. *See Frank v. State*, 183 S.W.3d 63, 68 (Tex. App.—Fort Worth 2005, pet. ref'd). In addition, depiction of the reality of this offense is powerful, probative evidence of the State's case. *See Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999).

Appellant also argues that there was a risk that the jurors would give undue weight to the photographs that they were, "in all probability, not equipped to evaluate," and while only a small amount of time was spent presenting the evidence, it nonetheless had a distracting effect on the jurors. But as the court of criminal appeals has observed, "[w]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done, we cannot hold that the trial court abused its discretion merely because it admitted the evidence." *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

The three photographs were not cumulative in the sense of being identical, nor was the number of photographs excessive.

Under these circumstances, the trial court could reasonably have determined that admitting the photographs did not present a danger of unfair prejudice that substantially outweighed their probative value. Therefore, the trial court did not abuse its discretion by overruling appellant's rule 403 objection and admitting the photographs into evidence. We thus resolve appellant's third issue against him.

**D.      Fourth Issue: Did the trial court err by dismissing the first jury panel "off the record"?**

Appellant's fourth issue argues that the trial court erred by dismissing the first jury panel off the record. Specifically, appellant asserts that the absence of a record on the voir dire and dismissal of the first venire precludes meaningful review of the trial court's actions for potential error on appeal.

But when the court said that the first panel had been dismissed "off the record" by agreement of the parties, appellant did not object to the absence of a record on the first voir dire or to continuing with the second panel. After the jury was selected from the second panel, appellant said that he had no objection to the jury. And, although appellant filed a motion for new trial, the motion did not complain about this issue.

To preserve a complaint for appellate review, a defendant must make a timely objection to the trial court, state with sufficient specificity the grounds for the ruling sought, and obtain an adverse ruling on his objection. TEX. R. APP. P. 33.1; *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006). There is no such objection here. Consequently, the issue was not preserved for our review. *See* TEX. R. APP. P. 33.1. We therefore reject appellant's fourth issue.

**E.    State's Cross-Point: Should the judgment be modified to include the jury's deadly weapon finding?**

In a cross-point, the State asks us to modify the judgment to reflect that the murder was committed by using a deadly weapon. Where the jury is the factfinder, as it was here, it is deemed to have made an affirmative deadly weapon finding if it finds the defendant guilty as alleged in the indictment and the indictment alleges a deadly weapon. *Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009).

Here, the indictment alleged that appellant committed murder by using a deadly weapon. The jury found appellant guilty as charged in the indictment. The judgment, however, does not include a deadly weapon finding. Instead, it says "Findings on Deadly Weapon: N/A."

Because the jury made a deadly weapon finding, the judgment should be modified to reflect that finding. We therefore sustain the State's cross-point and modify the judgment to include the jury's deadly weapon finding.

### III.     Conclusion

Having resolved all of appellant's issues against him, we modify the judgment to include a deadly weapon finding and, as modified, affirm.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
141626F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MARK EDWIN GUIDA, Appellant

No. 05-14-01626-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1263747-V.
Opinion delivered by Justice Whitehill.
Justices Lang and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** :
to include a deadly weapon finding
As **REFORMED**, the judgment is **AFFIRMED**.


Judgment entered May 13, 2016.

–17–