**Affirmed and Opinion filed October 31 , 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00309-CR

**BRANDON JOHNSON BARFIELD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1229325**

## O P I N I O N

Appellant Brandon Johnson Barfield appeals from his conviction for murder. A jury found appellant guilty and assessed punishment at 22 years and six months' imprisonment. In two issues, appellant contends that the trial court erred in admitting certain exhibits into evidence. First, appellant challenges the admission of cell tower records that were used to trace appellant's approximate locations during times relevant to the alleged murder and attempt to dispose of the body,

arguing that the State's obtaining the records without a search warrant violated the Fourth Amendment's prohibition against unlawful searches and seizures. Second, appellant challenges the authentication and admission of a "jailhouse letter" allegedly written by appellant and apparently seeking to establish an alibi. We affirm.

### *Background*

On August 18, 2009, Houston police officers and firefighters responding to a 9-1-1 call reporting a fire discovered that the flames originated from a human body lying in the front yard of a house. The body was subsequently determined by DNA testing to be that of complainant Roger McCray. An autopsy revealed the cause of death to be a gunshot wound to the head and the manner of death to be homicide. Next to the body at the scene, officers found part of a cardboard box with a Lowe's store label on it bearing the name "Lynell Johnson." After attaining further information from Lowe's, Sergeant Robert Blain, an investigator assigned to the case, contacted Johnson by telephone. Johnson stated that he was out of town and had been for over a week, but gave Blain permission to search his home before his return.

Officer David Smith of the HPD Forensics Division testified that he collected several pieces of evidence at Johnson's home that indicated a possible connection between the home and complainant's death. That evidence included pieces of cardboard that appeared to match the cardboard found next to complainant's body, pieces of broken glass on the floor in the kitchen, a tarp covered in a reddish fluid, a wet washcloth with red stains, a steak knife with cardboard fibers on the blade found on the garage floor, and a plastic gasoline can that showed signs of having been exposed to high temperature. Smith also observed and photographed a number of possible bloodstains at the property, and

2

he examined and photographed a Honda Element parked in the garage. The Element had apparently recently been cleaned on the inside of the back hatch; a pair of gloves, a bottle of cleaner, and some brushes were discovered behind the seats. Smith additionally took swabs of what appeared to be blood from the exterior of the Element's hatch.

Officer Dewitt Lambright, who works at the HPD vehicle examination building, processed the Element for evidence. Among other things, he collected swabs of what appeared to be blood from the interior and exterior of the vehicle. He also took fingerprints from the exterior. Lab analysis subsequently showed that DNA from the swabs matched complainant's, and a fingerprint expert determined that some of the prints matched those of appellant.

Sergeant Blaine and his partner contacted Johnson's relatives who had access to the home, including appellant, who is Johnson's grandson. Sergeant Blain interviewed appellant at the home; the interview was recorded and played for the jury at trial. When asked if he knew why the police were there, appellant replied that it had something to do with a murder or someone getting shot, although such information had yet to be released to the public. Appellant further revealed that he had been in possession of the Element between 1 p.m. on August 18, 2009, and 10 a.m. on August 19, when he returned it to Johnson's garage. He stated that he cleaned out the back of the vehicle because he had used it to take barbecue wood to his uncle, who lived near Arcola. Appellant additionally offered that he used the Element to pick up complainant, whom appellant described as a childhood friend.[1] Appellant said that he took complainant to complainant's brother's house, but when no one answered the door, appellant dropped complainant off at an

---

[1] At trial, the State called Brittany Washington as a witness, and she testified that she saw appellant pick up complainant while driving a Honda Element.

3

apartment complex. Appellant stated that he then went to see a female friend named Nikki and then to his friend Byron's house. Appellant also mentioned that he had dropped and broken a blue glass inside Johnson's house and had not cleaned it up. Blain was unable to locate the person named Byron appellant mentioned.

Appellant accompanied officers to police headquarters, where one officer noticed a strong odor of gasoline on appellant's hands and that hair on appellant's forearms and one hand had been singed. Appellant was arrested and charged with murdering complainant by shooting him with a deadly weapon, namely a firearm.

At trial, in addition to the evidence discussed above, the State offered cell tower records along with the expert testimony of Officer Michael Rone to establish appellant's whereabouts during times relevant to complainant's murder and the attempted disposal of the body. The State also used the evidence to show that appellant had not traveled "almost to Arcola" to deliver wood as he had indicated. The State obtained these records through use of a subpoena and not by obtaining a search warrant. Defense counsel objected to this evidence, arguing that obtaining the records without a search warrant violated the Fourth Amendment's prohibition on unlawful searches and seizures. The trial court overruled the objection and permitted the records to be admitted into evidence as well as Rone's testimony regarding the records.

The State also offered a letter purportedly written by appellant while in jail and possibly attempting to set up an alibi. Specifically in the letter, a request is made for the male recipient to "[c]all this girl name Litisha [telephone number omitted] tell her that I said if she ever gets question [sic] to just say I stopped by her house around 4 or 5 pm and from there went to my potna Byron house [sic]. That's critical . . . and I really need her to do that." Defense counsel objected to

4

the letter, asserting that it had not been properly authenticated. As will be described in more detail below, the State primarily sought to authenticate the letter through the testimony of Sergeant Mark Schmidt, a deputy sheriff at the Harris County Jail who intercepted the letter, as well as through the contents of the letter itself. The trial court overruled counsel's objection and admitted the letter into evidence.

At the close of trial, the jury found appellant guilty of murder and assessed punishment at 22 years and six months in prison. On appeal, he challenges the admission of the cell tower records and related expert testimony as well as the admission of the jailhouse letter.

### *Cell Tower Records*

In his first issue, appellant contends that the State's obtaining of cell tower data from appellant's service provider without a search warrant violated the Fourth Amendment's prohibition on unlawful searches and seizures. U.S. Const. amend. IV. On that basis, he further contends that admission of the cell tower records and related expert testimony violated the exclusionary rule. *See Mapp v. Ohio*, 367 U.S. 643, 656 (1961); *State v. Mazuca*, 375 S.W.3d 294, 300 (Tex. Crim. App. 2012). Although we generally defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling, such as whether a search or seizure governed by the Fourth Amendment occurred in a particular case, under a de novo standard of review. *See Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

In support of his position, appellant relies on the United States Supreme Court's recent opinion in *United States v. Jones*, 132 S. Ct. 945 (2012), and a recent federal district court opinion in *In re Application of the United States for Historical Cell Site Data*, 747 F. Supp. 2d 827 (S.D. Tex. 2010), *rev'd*, 724 F.3d

600 (5th Cir. 2013).  We find the *Jones* case, which dealt with placement of a GPS tracking device on a subject's vehicle, to be distinguishable on the facts. Moreover, as noted, subsequent to appellant's briefing in this case, the Fifth Circuit reversed the lower court's ruling in *In re Application of the United States*.  724 F.3d 600.  We concur with the reasoning expressed in the Fifth Circuit's opinion.

In *Jones*, the Court held that attaching a GPS tracking device to a vehicle and using the device to monitor the vehicle's movements was a search under the Fourth Amendment.  132 S. Ct. at 949.[2]  Appellant here contends that obtaining cell tower records is analogous to placing a GPS tracking device essentially because the results are similar in nature:  the State discovers where a suspect travelled over a prolonged period of time, in one circumstance, by directly tracing his vehicle and in the other, by using cell tower data to deduce what general areas the suspect made telephone calls from over a period of time.  The most obvious distinguishing factors between the circumstances in *Jones* and in this case are who initially collected the data in question and whether they did so with the respective suspect's knowledge.  In *Jones*, the government itself obtained the information by covertly mounting and monitoring a GPS tracking device on the suspect's vehicle. *Id*. at 948.  Here, the data was compiled and stored by appellant's service provider each time he voluntarily and knowingly made a call with his cell phone.  *Jones* is

---

[2] The Court in *Jones* expressed no opinion regarding whether the search therein was reasonable or lawful because that issue had not been raised below.  132 S. Ct. at 954.  Although four concurring justices in *Jones* would have held that the defendant in *Jones* had a "reasonable expectation of privacy" that was violated by use of the tracking device, the majority based its conclusion on a theory of trespass and not on a reasonable expectation of privacy.  *Id*. at 949-54; *id*. at 958, 962, 964 (Alito, J., concurring in the judgment) (joined by Justices Ginsburg, Breyer, and Kagan).  To be clear, the majority did not reject "reasonable expectations" as a test for whether a search has occurred; rather, the majority merely rejected the necessity or propriety of its use under the circumstances in *Jones*.  *Id*. at 949-54; *see also Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013) (explaining that the reasonable-expectations test first announced in *Katz v. United States*, 389 U.S. 347 (1992), had been added to and did not replace traditional Fourth Amendment precedent based on property interests).

therefore readily distinguishable on the facts.[3]

The facts in *In re Application of the United States* are far more analogous to those presently presented. 724 F.3d 600. In each case, a government actor obtained historical cell tower data—through the use of a subpoena or court order instead of a search warrant—from a third-party service provider, which had stored the data by its own volition and not pursuant to any directive from the government. *Id*. at 611-12.[4] The Fifth Circuit opinion hinges on a determination of whether individuals have a "reasonable expectation of privacy" in their location information transmitted each time they make a cell phone call and received and stored by their service provider. *Id*. at 615. The Fifth Circuit determined that no such reasonable expectation existed. *Id*.[5] Appellant here contends, with little exposition, that his reasonable expectation of privacy was violated by the State's obtaining of the cell tower records without a warrant.

---

[3] It should also be noted that the trespass theory used by the *Jones* majority has no application in the present case because the State here obtained the records from a third party and performed no act that could be considered trespass, even broadly defined. Therefore, the analysis is properly under the *Katz* reasonable-expectations test. *See In re Application of the United States*, 724 F.3d at 606.

[4] In *In re Application of the United States*, the court speculated that a service provider may collect and store cell site data "to monitor or optimize service on its network or to accurately bill its customers for the segments of its network that they use." 724 F.3d at 612. There is no specific evidence in the present case as to why appellant's service provider collected and stored the information, but it is clear that the government only sought the information after it was stored and did not require its collection.

[5] The government in *In re Application of the United States* obtained the cell tower records pursuant to provisions of the Federal Stored Communications Act, which permit the government to obtain such records through a court order. 18 U.S.C. § 2703; 724 F.3d at 602. Requests under section 2703 need only meet a lesser "specific and articulable facts" standard and not the stricter Fourth Amendment probable cause standard. *In re Application of the United States*, 724 F.3d at 615. In the present case, the State obtained the records through issuance of a subpoena and not a search warrant. The record here does not reveal anything further regarding the method used to obtain the records. Appellant, however, limits his appellate complaints to the securing of the records without a search warrant; accordingly, we need not consider whether the means used met any other possible criteria.

In determining that there was no reasonable expectation of privacy in such third party data, the Fifth Circuit emphasized the fact that the data in question was created by a third party provider each time appellant voluntarily used his cell phone to make a call, explaining that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id*. at 609 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1992)), 610. Although individuals may desire such information to remain private, the protection of a more general right of privacy, such as would be required to protect such transmissions, is not a matter for Fourth Amendment jurisprudence but is instead an issue for the marketplace or the political process. *Id*. at 609 (citing *Katz*, 389 U.S. at 350-51), 615.

When "an individual knowingly exposes his activities to third parties, he surrenders Fourth Amendment protections, and, if the Government is subsequently called upon to investigate his activities for possible violations of the law, it is free to seek out these third parties, to inspect their records, and to probe their recollections for evidence." *Id*. at 610 (quoting *Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1043 (D.C. Cir. 1978)). The mere fortuity of whether or not the third party, in its own discretion, elects to store the information does not make any constitutional difference. *Id*. (citing *Smith v. Maryland*, 442 U.S. 735, 745 (1979)). Once the individual exposes information to a third party, it can be used for any purpose, including conveying it to law enforcement authorities. *Id*. (citing *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984)).

The Fifth Circuit was careful to distinguish between the content of communications, *i.e.*, a phone conversation or text, where the third-party provider simply acts as a conduit for the content, and data collected and stored by the third-

party provider for its own business purposes, such as cell tower location or routing information. *See id*. at 611 (limiting the records that a third-party provider can be requested to turn over to transactions in which the record-keeper is a party) (citing *Smith*, 442 U.S. at 741, and *United States v. Forrester*, 512 F.2d 500, 511 (9th Cir. 2008)). The provider's records of transactions to which it was a party (such as a caller's conveying location information to the provider via cell tower data) are simply business records memorializing the transaction. *Id*. at 612.

Lastly, the Fifth Circuit emphasized that the transmission of location information by the cell user to the service provider is voluntary, specifically pointing out that users know they convey such information because they know generally that cell phones exchange signals with nearby cell towers, that if they are in an area without network towers, their call will not connect, and if they are in an area with heavy cell usage, they may also have trouble connecting. *Id*. at 612-13; *see also Smith*, 442 U.S. at 742 (explaining why landline telephone users can be held to understand that they convey telephone numbers to their service providers when they place a call). Ultimately, the user voluntarily decides to obtain a cell phone, choose a provider, and make a call from a particular location. *Id*. at 614.

We concur in the Fifth Circuit's analysis of this issue. The State's obtaining of cell tower records from the third-party provider did not violate reasonable privacy expectations as defined by *Katz* and its progeny. 389 U.S. at 353; *see also In re Application of the United States*, 724 F.3d at 605-06, 609-15. Consequently, the trial court did not violate the exclusionary rule in admitting the cell tower records and related expert testimony into evidence. We overrule appellant's first issue.

### *Jailhouse Letter*

In his second issue, appellant contends that the trial court erred in admitting

9

a jailhouse letter allegedly written by appellant seeking to establish an alibi. Appellant maintains that the State failed to properly authenticate the letter. Under Texas Rule of Evidence 901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a). Such authentication may be accomplished by testimony from a witness with knowledge that the item in question is what it is claimed to be. *Id*. 901(b)(1). The proponent is not required to establish beyond all doubt that the item is what the proponent claims it is. *Batiste v. State*, No. AP-76600, 2013 WL 2424134, at *6 (Tex. Crim. App. June 5, 2013). Moreover, the trial court need not be persuaded that the proffered evidence is authentic; the key question for admissibility is simply whether the proponent has supplied facts sufficient to support a reasonable jury determination that the evidence is authentic. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). We review the trial court's ruling on authentication issues under an abuse of discretion standard. *See Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998); *Page v. State*, 125 S.W.3d 640, 648 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Here, the State sought to authenticate the letter primarily through the testimony of Sergeant Mark Schmidt and the contents of the letter itself as they related to appellant's own earlier statement during his interview with Sergeant Blaine. Sergeant Schmidt testified that as a part of his job duties, he monitors incoming and outgoing mail from the Harris County jail system. He explained that not all inmate mail is monitored but that a "mail watch" had been requested for appellant. Schmidt stated that inmate mail is collected from secure mailboxes in each cell block, where mail is placed by the inmates. When there is a mail watch for a particular inmate, their mail will be photocopied, with the copy going to the

district attorney or investigator who requested the watch. For outgoing mail, inmates are required to include on the envelope their name, unique inmate identification number (called a Systems Person Number or "SPN"), the address and cell block of the jail facility where the inmate is housed, and the city, state, and zip code. Schmidt specifically testified that the envelope for the jailhouse letter in question, a copy of which was admitted into evidence as State's Exhibit 154, contained the unique identifiers indicating appellant placed the letter into the system. Schmidt further noted the letter bore a signature and did not appear to have been tampered with in any way except being "hole punched." On voir dire examination by defense counsel, Schmidt acknowledged that inmates had been known to send letters using another inmate's name, that he (Schmidt) was not a handwriting expert, and that he could not verify that the signature on the letter was in fact appellant's.

When counsel objected to admission of the letter for lack of proper authentication, the prosecutor pointed out that beyond the unique identifiers placed on the envelope, the contents of the letter echoed statements appellant made in his recorded interview with Sergeant Blaine. Specifically, in the letter, a request is made for the male recipient of the letter to contact a particular female and tell her that if she gets questioned, she should say that appellant stopped by her house around 4 or 5 p.m. on the day of the murder and then went to someone named Byron's house. These statements, if made by the female in question to police, would have supported the version of events appellant related to Sergeant Blaine: that after dropping complainant off at a particular location, appellant proceeded to see a female friend and then to his friend Byron's house.[6]

---

[6] In the interview, appellant stated that the female friend's name was "Nikki," but in the letter, the request was directed toward a female named "Litisha."

11

We hold that the combination of the unique identifiers and the contents in line with appellant's earlier comments to police was sufficient to support a finding that the matter in question is what its proponent claims, particularly where appellant has not presented any evidence suggesting tampering or falsification has occurred. *See* Tex. R. Evid. 901(a); *Tienda*, 358 S.W.3d at 638; *see also Druery v. State*, 225 S.W.3d 491, 502-03 (Tex. Crim. App. 2007) (holding facts letter purported to be from inmate and contained information that inmate would likely have possessed were sufficient to authenticate letter when inmate did not present any evidence of tampering or other fraud concerning the letter). The trial court did not abuse its discretion in admitting the letter over appellant's authentication objection. Accordingly, we overrule appellant's second issue.

We affirm the trial court's judgment.

/s/ Martha Hill Jamison
   Justice

Panel consists of Justices Boyce, Jamison, and Busby.

Publish — TEX. R. APP. P. 47.2(b).

12