# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00548-CR

**Eduardo Mora-Hernandez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 427TH JUDICIAL DISTRICT
### NO. D-1-DC-12-301539, HONORABLE JIM CORONADO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Eduardo Mora-Hernandez of the offense of manslaughter and assessed punishment at 20 years' imprisonment.[1] The district court rendered judgment on the verdict. In four issues on appeal, Mora-Hernandez asserts that the district court abused its discretion in overruling his motion to suppress (1) cell-phone records owned by his cellular-service provider and (2) statements that Mora-Hernandez had made during an interview with police officers, and in overruling his objections to (1) a photograph of the victim's remains and (2) expert testimony regarding cell-phone location technology. We will affirm the judgment of conviction.

## BACKGROUND

At trial, the jury heard evidence that on August 10, 2012, skeletal remains, later identified as belonging to Margaret Ann Robles, were discovered in a wooded area at Roy Guerrero

---

[1] *See* Tex. Penal Code § 19.04.

Park in Austin. An autopsy was performed on the remains. The likely cause of death, according to Travis County deputy medical examiner Leisha Wood, was blunt force trauma to the head, although Wood acknowledged that the decomposition of the remains had made it difficult for her to determine the exact cause of death.

Friends and family of Robles testified that Robles had been missing since June 2012. During the police investigation into Robles's disappearance, officers had focused their attention on Mora-Hernandez, Robles's ex-boyfriend, who was reportedly the last person to have seen her alive. Evidence implicating Mora-Hernandez in Robles's death, which we discuss in more detail below, included statements that Mora-Hernandez had made to police officers tending to show that he and Robles had a volatile relationship characterized by accusations of infidelity and fights, other statements tending to show that he had hit Robles in her head with his fist during one such fight, and cell-phone records tending to show that, on the night that Robles had disappeared, Mora-Hernandez had been present at the park where Robles's remains had been found. Based on the above and other evidence, the jury found Mora-Hernandez not guilty of the charged offense of murder but guilty of the lesser-included offense of manslaughter. The jury assessed punishment as noted above and the district court rendered judgment on the verdict. This appeal followed.

**STANDARD OF REVIEW**

We review a district court's evidentiary rulings for abuse of discretion.[2] We are to view the record "in the light most favorable to the trial court's determination, and the judgment will

---

[2] *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'"[3]

We consider the ruling in light of what was before the district court at the time the ruling was made.[4]

"We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on

any theory of law applicable to the case."[5]

Additionally, when reviewing rulings on motions to suppress, "[t]he appellate court

must apply a bifurcated standard of review, giving almost total deference to a trial court's

determination of historic facts and mixed questions of law and fact that rely upon the credibility of

a witness, but applying a de novo standard of review to pure questions of law and mixed questions

that do not depend on credibility determinations."[6]  "When there are no written findings explaining

the factual basis for the trial judge's decision, we imply findings of fact that support his ruling

so long as the evidence supports those implied findings."[7]  "Generally, implied findings would

be limited to the record produced at the suppression hearing."[8]  "However, when the parties

---

**3** *Story*, 445 S.W.3d at 732 (quoting *Dixon*, 206 S.W.3d at 590); *see Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex. Crim. App. 1991) (op. on reh'g).

**4** *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009).

**5** *Dixon*, 206 S.W.3d at 590 (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)); *see Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010).

**6** *Martinez v. State*, 348 S.W.3d 919, 922-23 (Tex. Crim. App. 2011) (citing *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)).

**7** *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011).

**8** *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007) (citing *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996)).

subsequently re-litigate the suppression issue at the trial on the merits, we consider all evidence, from both the pretrial hearing and the trial, in our review of the trial court's determination."[9]

## ANALYSIS

**Suppression issues**

Prior to trial, Mora-Hernandez had filed a motion to suppress evidence, asserting that (1) cell-phone records owned by his cellular-service provider had been illegally obtained by the State and (2) certain incriminating statements made by Mora-Hornandez to police officers had been obtained in violation of his *Miranda* rights.[10] Following a hearing, the district court denied the motion to suppress on each ground, and it again denied the motion when Mora-Hernandez re-urged these contentions during trial. In his first and second issues, Mora-Hernandez asserts that on each ground, the motion to suppress should have been granted.

### *Cell-phone records*

In an attempt to ascertain Mora-Hernandez's whereabouts on and around the night that Robles had disappeared, the Travis County District Attorney's Office had, by means of a court order, obtained certain records from Mora-Hernandez's cellular-service provider. The records, which tended to show where Mora-Hernandez's cell phone had been located during the time period when Robles had disappeared, were obtained without a search warrant. In his first issue, Mora-Hernandez asserts that the warrantless collection of those records violated his Fourth Amendment rights.

---

[9] *Id.*

[10] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

4

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[11] However, for the Fourth Amendment to be implicated, an individual must have a "reasonable" expectation of privacy in the place or object to be searched.[12] It is now well established that individuals have a reasonable expectation of privacy in the information stored within their cell phones.[13] However, the issue in this case is whether individuals have a similar reasonable expectation of privacy in historical cell-phone location information stored by cellular-service providers.

After the parties had briefed this issue, the Court of Criminal Appeals concluded that they do not. In *Ford v. State*, the defendant was charged with the murder of his ex-girlfriend, and the State's evidence included "historical cell-tower data" from the defendant's cellular-service provider revealing where Ford's cell phone had been located on the night of the murder.[14] Ford argued on appeal that the warrantless collection of this information violated his Fourth Amendment rights.[15] The Court of Criminal Appeals disagreed, observing that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the

---

[11] U.S. Const. amend. IV.

[12] *See Ford v. State*, 477 S.W.3d 321, 328 (Tex. Crim. App. 2015).

[13] *See Riley v. California*, 134 S. Ct. 2473, 2493 (2014) (holding that search warrant is generally required before officers may search information stored in cell phone); *State v. Granville*, 423 S.W.3d 399, 417 (Tex. Crim. App. 2014) (similarly holding that suspect has reasonable expectation of privacy "in the contents of his cell phone," even following arrest, and that police must obtain warrant before searching phone).

[14] *See* 477 S.W.3d at 325.

[15] *See id*. at 328.

third party will not be betrayed."[16] The court explained that Ford "neither owned nor possessed the records he sought to suppress. Rather, the cell-tower records are created by the cell-phone companies themselves and are subject to their control. [The provider] collects and stores this historical cell-site-location data for its own business purposes, in part to optimize service on its network. . . . The providers control what they record and how long these records are retained."[17] Moreover, the court added, individuals should know that when they use their cell phones, their location information is not private but is instead transmitted by cell towers to cellular-service providers, who record and store the information.[18] For these and other reasons, the court concluded that Ford "had no legitimate expectation of privacy in records held by a third-party cell-phone company identifying which cell-phone towers communicated with his cell phone at particular points in the past."[19]

We find *Ford* to be dispositive here. The information that was obtained by the State in this case is the same type of information that was obtained by the State in *Ford*. Accordingly, we cannot conclude that the district court abused its discretion in denying Mora-Hernandez's motion to suppress on the ground that Mora-Hernandez had no reasonable expectation of privacy in the cell-phone location information sought by the State.[20]

We overrule Mora-Hernandez's first issue.

---

[16] *Id*. at 329.

[17] *Id*. at 330-31 (internal citations omitted).

[18] *Id*. at 331.

[19] *Id*. at 330.

[20] *See id.* at 335; *Barfield v. State*, 416 S.W.3d 743, 749 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

6

*Custodial interrogation*

After Robles's remains had been discovered, Austin Police Department detectives Rogelio Sanchez and William White decided to interview Mora-Hernandez. The record reflects that Sanchez and White conducted two interviews with Mora-Hernandez at the police station on the same date and that at no point during either interview was Mora-Hernandez read his *Miranda* rights.[21] Following the first interview, which Mora-Hernandez concedes was non-custodial in nature, the detectives transported Mora-Hernandez to the park where Robles's remains had been found and, once there, Mora-Hernandez provided information to the detectives confirming that he had been at the park on the night that Robles had disappeared. After the detectives returned to the station with Mora-Hernandez, he was interviewed a second time. During this interview, Mora-Hernandez told Sanchez that he "ha[d] to have a lawyer." Sanchez nevertheless continued the interview, and Mora-Hernandez eventually made statements tending to implicate himself in Robles's death, including statements admitting that he had hit Robles in her head with his fist and that, after she had fallen to the ground and failed to get up, he had left her at the park alone. In his second issue, Mora-Hernandez asserts that these statements were inadmissible because he had invoked and been denied his Fifth Amendment right to counsel during the second interview, which he contends rose to the level of custodial interrogation.

"The Fifth Amendment prohibits the government from compelling a criminal suspect to bear witness against himself."[22] "In *Miranda v. Arizona*, the Supreme Court crafted safeguards

---

[21] *See* 384 U.S. at 444.

[22] *Pecina v. State*, 361 S.W.3d 68, 74-75 (Tex. Crim. App. 2012) (citing U.S. Const. amend. V).

7

to protect this 'privilege against self-incrimination' in the inherently coercive atmosphere of custodial interrogations."[23]  Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[24]  "Before questioning a suspect who is in custody, police must give that person *Miranda* warnings."[25]  "Only if the person voluntarily and intelligently waives his *Miranda* rights, including the right to have an attorney present during questioning, may his statement be introduced into evidence against him at trial."[26]  Moreover, once a suspect invokes his Fifth Amendment right to counsel, all police questioning must cease until counsel has been provided or the suspect initiates further communication with the police.[27]

However, the Fifth Amendment right to counsel applies only when a person is subject to custodial interrogation.[28]  Thus, if Mora-Hernandez was not in custody during the second interview, then the *Miranda* requirements do not apply.[29]  "When considering 'custody' for *Miranda* purposes, we apply a 'reasonable person' standard—'[a] person is in 'custody' only if, under the

---

[23]  *Id*. at 75 (citing *Miranda*, 384 U.S. at 441).

[24]  *Miranda*, 384 U.S. at 444.

[25]  *Pecina*, 361 S.W.3d at 75.

[26]  *Id*. (citing *Miranda*, 384 U.S. at 475).

[27]  *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda*, 384 U.S. at 474; *Pecina*, 361 S.W.3d at 75; *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010).

[28]  *See Miranda*, 384 U.S. at 444; *Pecina*, 361 S.W.3d at 75-76; *Estrada v. State*, 313 S.W.3d 274, 296 (Tex. Crim. App. 2010); *Dowthitt v. State*, 931 S.W.2d 244, 263 (Tex. Crim. App. 1996); *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990); *Hernandez v. State*, 107 S.W.3d 41, 47 (Tex. App.—San Antonio 2003, pet. ref'd); *Kelley v. State*, 817 S.W.2d 168, 173 (Tex. App.—Austin 1991, pet. ref'd).

[29]  *See Melton*, 790 S.W.2d at 326.

8

circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.'"[30] "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"[31] The determination of custody depends on the objective circumstances of the interrogation, not the subjective views of the person being questioned or the subjective intent of the officer to arrest or not arrest.[32] After the circumstances surrounding the interrogation are considered, the court must determine whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."[33] The "reasonable person" standard presupposes an innocent person.[34] Moreover, the defendant bears the burden to establish on the record "that the statements he wishes to exclude were the product of custodial interrogation."[35]

In making its determination of whether Mora-Hernandez was in custody, the district court considered a video recording of Mora-Hernandez's interviews with the police; a

---

[30] *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (quoting *Dowthitt*, 931 S.W.2d at 254).

[31] *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam))); *see Dowthitt*, 931 S.W.2d at 254; *Bartlett v. State*, 249 S.W.3d 658, 668 (Tex. App.—Austin 2008, pet. ref'd).

[32] *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 254; *Bartlett*, 249 S.W.3d at 669.

[33] *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *see Herrera*, 241 S.W.3d at 532.

[34] *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)); *Bartlett*, 249 S.W.3d at 669.

[35] *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005).

9

transcript of the interviews, translated from Spanish to English; and the testimony of Detective Sanchez, who had conducted the interviews with Mora-Hernandez. Sanchez testified that, on the day of the interviews, he and White went to Mora-Hernandez's house, identified themselves as police officers, and asked Mora-Hernandez if he would come with them to the station to answer questions regarding Robles's disappearance. Sanchez also testified that Mora-Hernandez was not under arrest and that they had informed Mora-Hernandez that the interview was voluntary and that he did not have to come with them to the station if he did not want to do so. According to Sanchez, Mora-Hernandez agreed to answer their questions at the station, and they transported him there.

The record reflects that the first interview with Mora-Hernandez began at approximately 1:00 p.m. and continued until 4:37 p.m., at which time Sanchez and White left the station with Mora-Hernandez and drove to the park where Robles's remains had been found. They returned to the station at approximately 6:00 p.m. and began the second interview.

On the recording of the second interview, Sanchez and Mora-Hernandez can be seen walking into the interview room together, with Sanchez holding bags of fast food that the detectives had picked up on their way back from the park. Sanchez then placed some of the food on a small, circular table in the room and asked Mora-Hernandez if he wanted a Dr. Pepper. Mora-Hernandez told Sanchez that he wanted a Coke instead and Sanchez left the room. Mora-Hernandez, who was not in handcuffs at any point during the interview, sat down at the table and began eating his food. A few minutes later, Sanchez returned to the room with a Coke, gave it to Mora-Hernandez, and then left the room again while Mora-Hernandez continued to eat. Approximately twenty minutes later, Sanchez returned to the room, collected the fast-food trash from the table, and then left the room. Several minutes later, Sanchez returned and the questioning began, with Sanchez seated across

10

the table from Mora-Hernandez. As the interview progressed, and Mora-Hernandez began to reveal more information, Sanchez moved his chair closer to Mora-Hernandez, and was seated between Mora-Hernandez and the door to the room. For certain portions of the interview, Detective White can also be seen in the interview room, mostly seated in a chair in the corner of the room, several feet away from Sanchez. The recording reflects that when White was present in the room, he was primarily a silent observer, although he occasionally asked Sanchez questions and directed Sanchez to ask Mora-Hernandez particular questions.

Sanchez and Mora-Hernandez can be heard on the audio portion of the recording speaking to each other in Spanish. However, the recording was transcribed and subsequently translated from Spanish to English. The transcript of the interview indicates that Sanchez told Mora-Hernandez on multiple occasions that he was free to leave, at one point telling him, "You are not arrested, there's the door, leave. You want us to take you home? I'll take you home, [and] we will continue the investigation." At another point during the interview, Sanchez told Mora-Hernandez, "[Y]ou can leave whenever you want," and Mora-Hernandez indicated that he understood. Sanchez also testified that the door to the interview room was unlocked. Additionally, Mora-Hernandez left the interview room on one occasion to use the bathroom, and he was alone in the interview room on multiple occasions while Sanchez either attended to other business or left to get Mora-Hernandez water and gum. In total, the second interview lasted approximately four hours and ended shortly after 10:15 p.m. At the end of the interview, Sanchez told Mora-Hernandez that he was "taking [him] home."

Mora-Hernandez points to several circumstances in the record to support his theory that he was in custody during the second interview, including: (1) the total length of time that Mora-

11

Hernandez had been accompanied by the officers that day, including both interviews and the visit to the park; (2) Sanchez positioning himself between Mora-Hernandez and the door as the second interview progressed; (3) the size of the interview room, which Sanchez acknowledged in his testimony was "small"; (4) the presence of two officers in the room at certain times during the interview; and (5) certain statements by Sanchez that, according to Mora-Hernandez, suggested that Sanchez would not "immediately honor" Mora-Hernandez's request to leave.[36] Although these facts could support a finding that Mora-Hernandez was in custody, they do not compel or conclusively establish such a finding, particularly when there are other facts in the record that support the district court's finding to the contrary. The objective circumstances that support the district court's finding that Mora-Hernandez was not in custody during the second interview include the following: (1) Mora-Hernandez was told that he was not required to accompany the detectives to the station and answer their questions; (2) during the interview, Sanchez told Mora-Hernandez on multiple occasions that he was free to leave; (3) Mora-Hernandez was not in handcuffs or other physical restraints at any point during the interview; (4) Mora-Hernandez seated himself when he entered the interview room; (5) Mora-Hernandez was provided food at the beginning of the interview and water during the interview; (5) Mora-Hernandez ate his food alone, without officers present; (6) at the times when White was in the interview room, he was not seated at the table with Sanchez and Mora-Hernandez but was instead seated in the corner of the room several feet away from Mora-Hernandez; (7) the detectives were in "plain clothes" during the interview; (8) Mora-Hernandez was left alone

---

[36] For example, at one point during the interview, Mora-Hernandez told Sanchez, "Well if, if you're going to drop me off where you picked me up, let's go." Sanchez replied, "You want to leave right now? You don't want to talk to me, this is your last chance right now." The interview continued.

12

in the interview room on multiple occasions; (9) the door was unlocked during the interview; (10) Mora-Hernandez was allowed to leave the interview room to use the bathroom; and (11) at the conclusion of the interview, Mora-Hernandez was not arrested but was transported home.

Again, we are to sustain the district court's suppression ruling if it is "reasonably supported by the record," and we can overturn the ruling only if it lies "outside the zone of reasonable disagreement."[37] Based on the totality of the objective circumstances summarized above, and viewing the evidence and all reasonable inferences therefrom in the light most favorable to the ruling, we conclude that the record reasonably supports the district court's determination that Mora-Hernandez's freedom of movement was not "restrained to the degree associated with a formal arrest."[38] Accordingly, we cannot conclude on this record that the district court abused its discretion in denying the motion to suppress on the ground that Mora-Hernandez failed to establish that he was in custody so as to trigger the *Miranda* requirements, including the Fifth Amendment right to counsel.[39]

We overrule Mora-Hernandez's second issue.

---

[37] *See Martinez*, 348 S.W.3d at 922; *Valtierra*, 310 S.W.3d at 448.

[38] *See, e.g.*, *Beheler*, 463 U.S. at 1121-25; *Mathiason*, 429 U.S. at 493-95; *Estrada*, 313 S.W.3d at 288-96; *Gardner v. State*, 306 S.W.3d 274, 293-95 (Tex. Crim. App. 2009); *Anderson v. State*, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996); *Meek v. State*, 790 S.W.2d 618, 619-23 (Tex. Crim. App. 1990); *Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987); *see also Bartlett*, 249 S.W.3d at 667-71 (distinguishing custody from other citizen-police interactions); *Rodriguez v. State*, 939 S.W.2d 211, 215 (Tex. App.—Austin 1997, no pet.) ("In reviewing the trial court's decision [on suppression], an appellate court does not engage in its own factual review; it determines only whether the record supports the trial court's findings.").

[39] *See Estrada*, 313 S.W.3d at 296.

13

**Evidentiary issues**

In his third issue, Mora-Hernandez asserts that the district court abused its discretion in admitting a photograph depicting Robles's skeletal remains, which Mora-Hernandez claims was more prejudicial than probative.[40] In his fourth issue, Mora-Hernandez asserts that the district court abused its discretion in admitting expert testimony.[41]

### *Photographic evidence*

During the testimony of Stacy Boatright, a crime scene specialist for the Austin Police Department, the State offered into evidence two color photographs depicting Robles's remains. The first photograph depicted the remains from what Boatright described as a "somewhat far distance." The second photograph showed the remains at closer range, revealing their advanced state of decomposition. Mora-Hernandez had no objection to the first photograph but objected to the second photograph as more prejudicial than probative. The district court overruled the objection.

"Rule 403 requires that a photograph have some probative value and that its probative value not be substantially outweighed by its inflammatory nature."[42] "A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and

---

[40] *See* Tex. R. Evid. 403.

[41] *See* Tex. R. Evid. 702.

[42] *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009) (citing Tex. R. Evid. 403; *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991)).

other circumstances unique to the individual case."[43] "'Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.'"[44] "All evidence is prejudicial to one party or the other—it is only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable."[45]

The district court would not have abused its discretion in finding that there was no such "clear disparity" here. Mora-Hernandez asserts that the photograph "did nothing to advance the argument that [Mora-Hernandez] was responsible for the death of Robles." However, the State's theory of the case was not merely that Mora-Hernandez was responsible for Robles's death, but that he had caused her death on or around the date that she had disappeared and had hid her body where it would not be discovered. It would not be outside the zone of reasonable disagreement for the district court to conclude that a photograph depicting Robles's remains in an advanced state of decomposition was probative of the timing and location of Robles's death, which in turn corresponds to evidence of Mora-Hernandez's location at the time, so as to establish Mora-Hernandez's responsibility for her death and disappearance. Additionally, it would not be outside the zone of reasonable disagreement for the district court to conclude that the photograph was probative of other issues in the case, including: (1) why it was difficult for the medical examiner to determine the exact cause of death; (2) whether Mora-Hernandez had intended to hide the body

---

[43] *Id*. (citing *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997); *Long*, 823 S.W.2d at 272).

[44] *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010) (quoting *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009)).

[45] *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012).

15

where it could not be found; and (3) whether the physical evidence in the case was consistent or inconsistent with the statements that Mora-Hernandez had made to the police.

Nor would the district court have abused its discretion in finding that the probative value of the photograph was not substantially outweighed by its inflammatory nature. The State acknowledges in its brief that the photograph is "disturbing and gruesome." However, "[a] trial court does not err merely because it admits into evidence photographs which are gruesome."[46] Given the nature of this case, which involved the killing of a woman and the abandonment of her body in a secluded area where her remains would not be found for two months, it would not be outside the zone of reasonable disagreement for the district court to conclude that the photograph "depict[ed] nothing more than the reality of the brutal crime committed."[47] We also observe that the challenged photograph was the only photograph admitted into evidence that revealed the advanced state of decomposition of the remains, which supports a finding by the district court that the evidence was not "needlessly cumulative" of other evidence.[48] On this record, we cannot conclude that the district court abused its discretion in admitting the photograph.[49]

We overrule Mora-Hernandez's third issue.

---

[46] *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (citing *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992); *Burdine v. State*, 719 S.W.2d 309, 317 (Tex. Crim. App. 1986)).

[47] *See id*.

[48] *See* Tex. R. Evid. 403.

[49] *See Williams*, 301 S.W.3d at 690-93; *Paredes v. State*, 129 S.W.3d 530, 539-40 (Tex. Crim. App. 2004); *see also Davis*, 313 S.W.3d at 331; *Estrada v. State*, 352 S.W.3d 762, 770-71 (Tex. App.—San Antonio 2011, pet. ref'd).

16

*Expert testimony*

The State called Shelia Hargis, a crime analyst supervisor for the Austin Police Department, to provide testimony concerning the analysis and interpretation of the cell-phone location information that had been obtained by the State. During her testimony, the State offered into evidence maps that Hargis had prepared to illustrate her analysis and findings in the case. Mora-Hernandez objected on the ground that Hargis was not "qualified as an expert in this area to draw these types of maps." After Hargis provided additional testimony regarding her training and experience, Mora-Hernandez maintained his objection, asserting that Hargis had failed to demonstrate an ability "to make this type of analysis without a mathematical background." The State argued in response that Hargis did not need to possess a background in mathematics to discuss the evidence that she would present. The district court overruled the objection.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."[50] "Thus, before admitting expert testimony under Rule 702, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of [her] knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case."[51] In this case, Mora-Hernandez challenges Hargis's qualifications.

---

[50] Tex. R. Evid. 702.

[51] *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).

"Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case."[52] "'Absent a clear abuse of that discretion, the trial court's decision to admit or exclude testimony will not be disturbed.'"[53]

"There is no rigid formula for determining when an expert is qualified to testify."[54] "[A]n appellate court should consider three criteria when determining whether a trial court abused its discretion in evaluating a witness's qualifications as an expert: (1) 'is the field of expertise complex?'; (2) 'how conclusive is the expert's opinion?'; and (3) 'how central is the area of expertise to the resolution of the lawsuit?'"[55] "[T]he proponent must 'establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject.'"[56] "The focus, then, is on the 'fit' between the subject matter at issue and the expert's familiarity therewith, and not on a comparison of the expert's title or specialty with that of the defendant or a competing expert.'"[57]

Here, the subject matter at issue were maps showing where Mora-Hernandez's cell phone had been located at particular points in time. When asked how she was qualified "to do this

---

[52] *Id*. at 527-28.

[53] *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006) (quoting *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000)).

[54] *Robinson v. State*, 368 S.W.3d 588, 600 (Tex. App.—Austin 2012, pet. ref'd) (citing *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App.—Austin 1999, pet. ref'd)).

[55] *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (quoting *Rodgers*, 205 S.W.3d at 528).

[56] *Id*. at 132 (quoting *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)).

[57] *Id*. at 133 (quoting *Broders*, 924 S.W.2d at 153).

sort of mapping" and to explain her "training in this type of analysis," Hargis testified that she had attended "a couple of classes" on phone analysis: (1) a 16-hour course taught by a Houston Police Department sergeant whose job is "to do the phone investigative side of phone tracking and analysis" and whose unit "does this all the time"; and (2) a 28-hour course "taught by an intel analyst with the Royal Canadian Mounted Police who has done extensive phone analysis." Hargis added that she had "somewhat associated training in Analyst's Notebook which is actually one of the software applications I used to do the phone time lines." When asked to describe her process in creating the maps, Hargis explained that she "prepare[d] the data in a form to be imported into a software application," in this case "Microsoft's Streets and Trips," and that "[w]hen you import it in, it takes the GPS coordinates that you have on your spreadsheet and puts dots on a map." Hargis was also asked if "determining the azimuth [i.e., the angle or direction,] and potential radius of each potential antenna" on a cell tower was "something the program does or is that something that you're trained to do." Hargis testified, "Well, that information is in the record. So the merging of the call detail records with the tower information is something I've been trained to do." Hargis also testified that she had performed this type of analysis "in approximately 44 cases," including one or two cases in which she had testified.

Hargis further testified that as a homicide analyst, she works with "a lot of products that help simplify the information we're getting," including association charts, timelines, and "thumb analysis" showing "what towers were hit by phones during a certain time frame." Hargis acknowledged that she had no degree in mathematics, although she did have a degree in criminal justice. The State also elicited the following testimony in response to Mora-Hernandez's argument that Hargis was unqualified by virtue of not having a background in mathematics:

19

Q.      Ms. Hargis, in your training and experience as a police officer in doing this type of analysis, you've heard defense counsel allude to advanced math skills that he assumes are required to do this type of analysis. Is that true? Do you have to have an advanced math degree to do this type of analysis?

A.      No, sir. I mean, I can't explain the engineering side of how cell phones work, but I can, given the data that the phone company gives us, I can tell you where the towers are that are involved in that phone call.

Q.      And you're able to tell based on the information that's given what the azimuth is? In other words, what direction the towers point—or the antennas point and then calculate 120 degrees on either side of that?

A.      Yes. I mean, the azimuth is a column in the spreadsheet and it will say 0 degrees or 120 degrees or something. So there's no interpretation of that. It's just that. And then the next step is to know how to read a compass and to know that north is 0 degrees and south is 180 degrees.

Q.      So no cosigns—

A.      No.

Q.      —no advanced trigonometry or geometry is required?

A.      No.

In summary, in addition to her general experience as a homicide analyst, Hargis testified that she had performed this particular type of phone analysis in approximately 44 cases, including at least one case in which she had provided testimony on the subject matter. Additionally, Hargis testified that she had attended two courses on the subject, one 16 and one 28 hours in length, and that both courses were taught by police officers who were themselves, according to Hargis's testimony, experienced in this type of analysis. As for her lack of a background in mathematics, Hargis testified that such a background was not necessary, and the district court would not have abused its discretion in crediting this testimony, particularly in light of Hargis's other testimony tending to show that the maps were created using a software application with which she was familiar.

20

According to Hargis, the software performed the necessary mathematical calculations after she had imported the relevant data into the application, a task that Hargis testified she was "trained to do." On this record, we cannot conclude that the district court clearly abused its discretion in finding that Hargis's qualifications were sufficient to "help the trier of fact to understand the evidence" presented by the State.[58]

We overrule Mora-Hernandez's fourth issue.

### CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed: November 9, 2016

Do Not Publish

---

[58] *See* Tex. R. Evid. 702; *Rodgers*, 205 S.W.3d at 527; *Robinson*, 368 S.W.3d at 601; *see also Wilson v. State*, 195 S.W.3d 193, 200-02 (Tex. App.—San Antonio 2006, no pet.) (holding that cell phone company employee was qualified to testify about cell phone tracking based on training and experience in interpreting cell phone records).