

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1269-16

**CHRISTOPHER JAMES HOLDER, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE FIFTH COURT OF APPEALS
## COLLIN COUNTY

YEARY, J., filed a concurring and dissenting opinion.

### CONCURRING AND DISSENTING OPINION

I agree with the Court's resolution of Appellant's statutory claim. That resolution is

consistent with our opinion last year in *Sims v. State*, 569 S.W.3d 634 (Tex. Crim. App.

2019). To that extent, I concur in the result the majority reaches today.

I part ways with the Court, however, in its interpretation of Article I, Section 9 of

the Texas Constitution. TEX. CONST. art. I, § 9. We did not originally grant review of

Appellant's claim predicated on Article I, Section 9, and Appellant did not raise a Fourth

Amendment claim on direct appeal. *Holder v. State*, No. 05-15-00818-CR, 2016 WL 4421362 (Tex. App.—Dallas Aug. 19, 2016) (not designated for publication); U.S. CONST. amend. IV. After the petition was granted and pending resolution in this Court, Appellant filed a motion requesting that we remand the cause to the court of appeals for further consideration of his Article I, Section 9, claim in light of the United States Supreme Court's intervening decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). Although Carpenter resolved only a Fourth Amendment issue, Appellant noted that this Court, in *Hankston v. State*, 517 S.W.3d 112 (Tex. Crim. App. 2017), had tethered its construction of Article I, Section 9, to the Supreme Court's interpretation of the Fourth Amendment. But rather than remand the cause, as Appellant had requested, this Court simply ordered the parties to file additional briefs addressing whether we should revisit our construction of Article I, Section 9, in view of *Carpenter*. *Holder v. State*, ___ S.W.3d ___, No. PD-1269-16, 2019 WL 5445198 (Tex. Crim. App. 2019).

Instead of slavishly following *Carpenter*, as the Court now does, I would adhere to the construction that we unanimously placed upon Article I, Section 9, of our State Constitution in *Hankston*. Given that our construction in *Hankston* was the one that we said "ma[d]e[] more sense" to us, 517 S.W.3d at 120, it is far from clear to me that we should follow *Carpenter*'s lead.

The Texas Constitution means what it means, and that meaning does not vary on the whim of a majority of Justices sitting at any given moment on the United States Supreme Court. It is instead emphatically the duty of the Judges of this Court—the court of last resort for criminal cases in our state—to construe our own state constitution to mean

exactly what it says, no more and no less. For that reason, an unexpected pronouncement from the United States Supreme Court with respect to the scope of Fourth Amendment protections cannot change the meaning of our analog state constitutional provision, Article I, Section 9, once we have authoritatively construed it. Only when the people of Texas amend our constitution does it change at all.

We have long recognized our own prerogative to construe provisions of our own state constitution either more or less protectively of individual rights than the United States Supreme Court construes analogous provisions of the United States Constitution. As we noted in *Hulit v. State*, 982 S.W.2d 431, 437 (Tex. Crim. App. 1998), the scope of the protection of individual rights embodied in the Texas Constitution "may be lesser, greater, or the same as those of the federal constitution." What this fundamental concept of federalism ultimately means is that "the Texas Constitution will be interpreted independently." *Id*. We further explained that "[t]he Supremacy Clause [of the United States Constitution] means that, in practical terms, persons will always be able to avail themselves of the greater right. * * * But it does not mean that a court, faithfully interpreting state laws, can only find in them protections that equal or exceed federal laws." *Id*.[1]

---

[1] In *Hulit*, we held that, unlike the Fourth Amendment, "the warrant clause in [Article I,] Section 9 [of the Texas Constitution] does not mean that a warrant is indispensable to a valid search and seizure." 982 S.W.2d at 435. Moreover, we have long held that Article I, Section 9, does not incorporate an exclusionary rule. *See id*. at 439 (Keller, P.J., concurring) (citing *Welchek v. State*, 93 Tex. Crim. 271, 280–81, 247 S.W. 524, 529 (1922), for the proposition that there is no exclusionary rule embedded in Article I, Section 9); *Richardson v. State*, 865 S.W.2d 944, 948 n.3 (Tex. Crim. App. 1993) (same); *Bauder v. State*, 921 S.W.2d 696, 700 (Tex. Crim. App. 1996) (Clinton, J., concurring) (same).

In our opinion in *Ford v. State*, 477 S.W.3d 321, 334–35 (Tex. Crim. App. 2015), every participating member of this Court joined in holding that the Fourth Amendment permitted the State to obtain without a warrant historical cell-site-location information (CSLI) of four days' duration, even while acknowledging "that Fourth Amendment concerns might be raised if long-term location information were acquired[.]" Observing that the United States Supreme Court was "primed" to take up this issue, we predicted that it would eventually hold that the State's warrantless acquisition of no more than four days' worth of CSLI data from Ford's service provider would be found acceptable because it "falls squarely inside the third-party-doctrine ball-park." *Id*. at 335; *see also Love v. State*, 543 S.W.3d 835, 841 (Tex. Crim. App. 2016) (holding, on authority of *Ford*, that "Appellant's call logs and CSLI are not . . . constitutionally protected"). Sixteen months later, the United States Supreme Court had still not taken up the issue, and we were confronted with the question whether we would construe our own constitutional analog any differently than we had foreseen the United States Supreme Court resolving the Fourth Amendment question. We opted to follow the path we thought the United States Supreme Court would eventually take in its Fourth Amendment jurisprudence, as we had predicted in *Ford*. *Hankston*, 517 S.W.3d at 120.

Accordingly, we held in *Hankston* that it would be consistent with Article I, Section 9, for the State to obtain some twelve months of CSLI data without a warrant. *Id*. at 114, 121–22. We explained that "[t]here was a voluntary conveyance of the cell phone records, and, under the third-party doctrine, that conveyance destroyed the reasonable expectation of privacy in the conveyed information." *Id*. at 122. We applied the third-party doctrine to

reach this result, not because we deemed ourselves bound to interpret Article I, Section 9, of our own constitution in lockstep with Fourth Amendment jurisprudence, but because we thought it made "more sense" to construe both the Fourth Amendment and Article I, Section 9, in this way. *Id*. at 120. Our original opinion in *Hankston* was unanimous.

As it turns out, our prediction about how the United States Supreme Court would interpret the Fourth Amendment was wrong. In *Carpenter*, a majority of the United States Supreme Court declined to extend the third-party doctrine to cover CSLI records—at least for any period of time greater than seven days. *See* 138 S. Ct. at 2217 n.3 ("It is sufficient for our purposes today to hold that accessing seven days of CSLI constitutes a Fourth Amendment search."). Three dissenting Justices argued vigorously, and at length, that the third-party doctrine applies, if anything, with even greater force in the CSLI context, and that a cell-phone user simply lacks any expectation of privacy in records kept by his service provider. *Id*. at 2226–33 (Kennedy, J., dissenting, joined by Thomas and Alito, JJ.).[12] This

---

[2] In explaining in *Carpenter* the reason why he disagreed with the majority's rejection of the third-party doctrine in the context of CSLI evidence, Justice Kennedy observed:

> [T]he Court maintains . . . [that] cell-site records are "unique" because they are "comprehensive" in their reach; allow for retrospective collection; are "easy, cheap, and efficient compared to traditional investigative tools"; and are not exposed to cell phone service providers in a meaningfully voluntary manner. [Citing majority opinion, 138 S. Ct. at 2216–228, 2220, 2223.] But many other kinds of business records can be so described. Bank and credit card companies keep a comprehensive account of almost every transaction an individual makes on a daily basis. "With just the click of a button, the Government can access each [company's] deep repository of historical [financial] information at practically no expense." [quoting majority opinion at 2218.] And the decision whether to transact with banks and credit card companies is no more or less voluntary than the decision whether to use a cell phone. Today, just as when [*United States v. Miller*, 425 U.S. 435 (1976)] was decided, "'it is impossible to participate in the economic life of contemporary society without maintaining a bank account.'" 425 U.S. at 451 (BRENNAN, J.,

was the position that we ourselves unanimously said made "more sense" in *Hankston*. Why, exactly, does it no longer make more sense?

While there are procedural similarities, this case is not ultimately like *Crittenden v. State*, 899 S.W.2d 668 (Tex. Crim. App. 1995). At issue in *Crittenden* was whether we should construe Article I, Section 9, the same as the Fourth Amendment with respect to the issue of so-called pretext stops. Three years earlier, this Court had construed the Fourth Amendment to embrace an objective approach to this issue. *Garcia v. State*, 827 S.W.2d 937 (Tex. Crim. App. 1992). But the United States Supreme Court had not spoken authoritatively on that issue when we decided *Garcia*. Thus, there was no construction of the Fourth Amendment with respect to the issue of pretext stops for this Court to consider. We adopted the objective test from among competing alternatives in *Garcia* simply because we said it was the standard that made "more sense" to us.

That being the case, when it came time to decide in *Crittenden* whether to deviate from our construction of the Fourth Amendment in interpreting Article I, Section 9, we adhered to the standard that had made "more sense" to us in *Garcia*. *Crittenden*, 899

---

dissenting). But this Court, nevertheless, has held that individuals do not have a reasonable expectation of privacy in financial records.

*Carpenter*, 138 S. Ct. 2232–33 (Kennedy, J., dissenting). This reasoning mirrors our own in *Ford*, which led us to conclude that, "like the bank customer in *Miller*, . . . appellant cannot meet the reasonable-expectation-of-privacy test." *Ford*, 477 S.W.3d at 331. *See also* David Stone, Comment, *Saving America's Privacy Rights: Why* Carpenter v. United States *Was Wrongly Decided and Why Courts Should Be Promoting Legislative Reform Rather Than Extending Existing Privacy Jurisprudence*, 51 St. Mary's L.J. 223, 270 (2019) ("Mr. Carpenter was not searched under either of the Supreme Court's search tests. Because Mr. Carpenter did not own the CSLI, he cannot win under the trespass test. Alternatively, Mr. Carpenter did not have a reasonable expectation of privacy in CSLI voluntarily conveyed to the cell phone company by purchasing its services.").

S.W.2d at 673 & n.8. Thus, we chose to apply the objective test under Article I, Section 9, not as a purely logical proposition—that, because we had previously construed the Fourth Amendment that way, logic dictated that we must also construe Article I, Section 9, the same way—but because it made "more sense" to us, deciding the issue in a precedential vacuum, to interpret both provisions that way. *Id.*[3] As it happens, the United States Supreme Court eventually agreed, adopting the objective test for Fourth Amendment purposes a year later in *Whren v. United States*, 516 U.S. 690 (1996).

Here, the opposite has occurred. What made more sense to all of us regarding the scope of the third-party doctrine—both in attempting to predict the United States Supreme Court's eventual Fourth Amendment holding, in *Ford*, and in our own independent construction of Article I, Section 9, in *Hankston*—did not correspond with the United States Supreme Court's ultimate view of the Fourth Amendment in *Carpenter*. That does not mean we are now obliged to abandon our own view of what makes "more sense," at least for purposes of Article I, Section 9. Especially in light of the strong arguments

---

[3] The Court emphasized in *Crittenden* that it was construing an aspect of search and seizure jurisprudence about which "the Supreme Court has not authoritatively spoken." 899 S.W.2d at 673 n.8. In that context, the Court declared that, "[a]bsent some significant difference in the text of [the Fourth Amendment versus Article I, Section 9], or some historically documented difference in attitude between the respective drafters, there would be no apparent reason to prefer an interpretation of Article I, [Section] 9 any different than *our preferred interpretation* of the Fourth Amendment." *Id.* (Emphasis added). By this the Court in *Crittenden* did not mean to say, as the Court implies today, that we should always construe the two provisions in lock-step absent some textual or historical reason not to—our "own lights" notwithstanding. See Majority Opinion at 10 (quoting *Olson v. State*, 484 S.W.2d 756, 762 (Tex. Crim. App. 1969)). Instead, the *Crittenden* footnote stands as an expression of intent, whenever we write on a clean jurisprudential slate, to construe Article I, Section 9, in the way we think the Supreme Court ought to construe the Fourth Amendment—not necessarily the way the Supreme Court may actually come to construe it later on. The Court today errs to understand it otherwise.

marshaled by the dissenters against the *Carpenter* majority's refusal to apply the third-party doctrine in the CSLI context, it is not at all clear why our previous construction of Article I, Section 9, no longer makes "more sense" to the Court.

The Court today professes to have changed its mind because of Chief Justice Roberts's exhaustive analysis of "the privacy issues implicated by CSLI, which we did not do in our original *Hankston* opinion[.]" Majority Opinion at 21. It is not clear to me that the Court did not consider these arguments in *Hankston*—and reject them. *See* 517 S.W.3d at 116 ("According to Appellant, this same expectation of privacy applies even more to cell phones because in today's society cell phones never leave our sides, and allowing data points to be created in numerous public and private locations enables the State to virtually reconstruct one's past actions and deduce a tremendous amount of private information."); *id*. at 121 ("In *Ford*, we acknowledged, but declined to follow, the reasoning that '[p]eople cannot be deemed to have volunteered to forfeit expectations of privacy by simply seeking active participation in society through use of their cell phones. We were not persuaded by the argument that cell phone users must forego the use of technology that has become a pervasive and insistent part of modern, everyday life or forego the protections of the Fourth Amendment.") (internal quotation marks omitted); *id*. at 122 n.63 (expressly declining to follow the lead of the Supreme Judicial Court of Massachusetts holding that "the nature of cellular telephone technology and cell phone data and the character of cellular telephone use in our current society render the third party doctrine . . . inapposite"). But if the Court genuinely failed to consider these arguments in *Hankston*, of which it was aware, one might fairly wonder *why*.

The Court also reviews "the constitutional debates in Texas, which we did not previously do," and, according to the Court, "they show no intention on the part of our framers for Texas citizens to have less protection from unreasonable searches and seizure[s] under the Texas Constitution than the United States Constitution." Majority Opinion at 21. Again, one might fairly ask *why* the Court failed to consult relevant sources before, if in fact it did fail.

More alarmingly, the Court's categorical description of the framers' intentions suggests that *Hulit* itself was wrongly decided—that we are *not* at liberty to construe Article I, Section 9, *less* protectively than the United States Supreme Court construes, or may eventually come to construe, the Fourth Amendment. Is that really what the Court means to say today? The Court does not purport to overrule *Hulit*, or any of the other cases that have in fact construed Article I, Section 9, to be less protective.[4] Indeed, the Court itself continues to assert in its opinion today that "there is no implied warrant requirement in Article I, Section 9." Majority Opinion at 22 (citing *Hulit*, 982 S.W.2d at 436). Have we been wrong since *Mapp v. Ohio*, 367 U.S. 643 (1961), to think that Article I, Section 9, imposes no exclusionary rule?

The Court declares that for us to continue to apply the third-party doctrine in the CSLI context would "amount to us being different just because we can[.]" Majority Opinion at 22. But there is a big difference between "being different just because we can" and fairly questioning the infallibility of the United States Supreme Court. To what

---

[4] *See* note 1, *ante*.

amounts to this Court's abdication of its "own lights," Majority Opinion at 10 (quoting

*Olson v. State*, 484 S.W.2d 756, 762 (Tex. Crim. App. 1969)), I respectfully dissent.


FILED:          March 11, 2020
PUBLISH